IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ALTA MARIE MILLER, *et al.*, | : | Case No. 1:16-cv-937 |
| | : | |
| Plaintiffs, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER GRANTING IN PART AND** |
| | : | **DENYING IN PART DEFENDANTS'** |
| CHRIST HOSPITAL, *et al.*, | : | **MOTION FOR SUMMARY** |
| | : | **JUDGMENT AND DENYING** |
| Defendants. | : | **PLAINTIFF'S MOTION FOR** |
| | : | **PARTIAL SUMMARY JUDGMENT** |

This matter is before the Court for consideration of Plaintiffs' Motion for Partial Summary Judgment (Doc. 26) and Defendants' Motion for Summary Judgment (Doc. 27). Appropriate responses and replies have been filed. (Docs. 28, 29, 33, and 34). The Court heard oral argument regarding these motions on November 14, 2019.

Plaintiffs, a deaf couple, allege that they are entitled to certain auxiliary aids and services and specific policy modifications under Title III of the Americans with Disabilities Act, ("ADA"), 42 U.S.C. §§ 12181–12189, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Ohio Revised Code § 4112.02(G). Defendants, a hospital and an affiliated organization of physicians, respond that they have extensive policies in place to ensure that they meet or exceed all obligations to individuals with disabilities, including Plaintiffs.

For the reasons that follow, the Court will **DENY** Plaintiff's Motion for Partial Summary Judgment (Doc. 26) and **GRANT** Defendants' Motion for Summary Judgment (Doc. 27) only as to Counts IV, V, and VI. Defendants' Motion for Summary Judgment will be **DENIED** as to Counts I, II, and III.

## I. BACKGROUND

### A. Facts

As cross-motions for summary judgment would imply, many of the facts in this case are undisputed. Plaintiffs Alta Marie and Matthew Miller, a married couple, are both deaf. Mr. Miller lost his hearing as a child. He has a basic understanding of written English, and he is able to use his voice for limited communication. Mr. Miller is able to read lips only if the person speaking faces him directly, has no facial hair, speaks slowly, and deliberately moves their mouth to form words. Even under optimal conditions, Mr. Miller estimates that he is able to understand forty or fifty percent of what is being said. (M. Miller Aff., Doc. 23-1 at PageID 548–49.)

Ms. Miller has been deaf since birth. She has limited ability to read, write or understand written English. She is able to speak some English, but her words may be unintelligible to those unfamiliar with her speech patterns. American Sign Language ("ASL") is the primary language for both Mr. and Ms. Miller.

The Millers obtain medical care from Defendants The Christ Hospital and The Christ Hospital Physicians (collectively "TCH"). The Millers are not the only deaf patients who receive treatment at TCH.

TCH maintains a Patient and Guest Services Department staffed by an Experience Officer, Senior Patient Representatives, and an Administrative Assistant. (Cheyne Dep.,[1] Doc. 19-3 at PageID 185.) Each morning, TCH runs a "TCH Interpreter Language" report indicating how many patients or companions at TCH that day require an interpreter and their preferred

---

[1] Dana Cheyne is a Senior Patient Representative at TCH.

language, including ASL. (*Id.* at PageID 186.) In addition, TCH provides annual training on interpreter services and language access. (*Id.* at PageID 187–88.) TCH offers this mandatory training to all employees as part of the online education system at TCH, and completion of the training is reflected in an individual's employment file. (*Id.* at PageID 187.)

If a patient requests an interpreter, TCH contacts one or more of five agencies with which it contracts to provide interpreters. (Doc. 19-3 at PageID 212.) TCH attempts to schedule an interpreter as soon as a patient makes an appointment. (*Id.* at PageID 193.) If deaf people come to the emergency room (either by ambulance or self-transport), TCH requests an interpreter for them once they arrive at the emergency room. (*Id.* at PageID 195.) According to TCH policy, interpreters are instructed to arrive 15 minutes before the required appointment time. (*Id.* at 193.) If an emergency arises or TCH is unable to secure an in-person interpreter, TCH provides approximately 13 devices for Video Remote Interpreting services ("VRI"). (*Id.* at PageID 213.)

Beginning in 2014, the Millers have received health care from TCH on at least 414 occasions. During approximately 370 of those visits, TCH provided effective ASL interpreters. However, the Millers identify 44 visits during which they encountered problems with interpreters and/or auxiliary aids. (Doc. 33 at PageID 1092–96.) Twenty-five of these unsatisfactory visits involved scheduling problems or communication mishaps between TCH and the interpreter (e.g., interpreter arrived late, went to the wrong location, or was not informed of a scheduling change). For nine of these unsatisfactory visits, TCH failed to request an interpreter (this number includes an emergency room visit on January 11, 2019 where TCH did not request an interpreter until the Millers arrived at TCH emergency room thereby forcing Mr. Miller to use a staff member's phone to type messages back and forth until an interpreter arrived). On three of these unsatisfactory visits, TCH used VRI to communicate with the Millers. The Millers found the

VRI ineffective, however, because the VRI device malfunctioned, was not placed in such a way that both Mr. and Ms. Miller could view the screen, or was turned off every time the doctor left the room (thereby imposing a new interpreter once the device was restarted upon the doctor's return). For five of the unsatisfactory visits, TCH provided an interpreter whose gender did not match that of the patient for procedures during which private body parts would be exposed (e.g., a male interpreter for Ms. Miller's gynecological examination or a female interpreter for Mr. Miller's hernia procedure).

On November 18, 2017, Mr. Miller was denied an x-ray without an appointment because he required an interpreter. Specifically, on November 17, 2017, Mr. Miller's doctor referred him for a neck x-ray. Mr. Miller contacted the appropriate facility via videophone and was told he did not need an appointment for an x-ray. Upon arriving at that same facility the next day, Mr. Miller was told that he could not have an unscheduled x-ray because he required an interpreter. (M. Miller Aff., Doc. 23-1 at PageID 570.)

Finally, the Millers allege that TCH's failure to provide an interpreter or VRI for Ms. Miller's September 21, 2014 emergency room visit resulted in her misdiagnosis. (Doc. 23-1 at PageID 550–53.) Mr. Miller took his wife to the TCH emergency room shortly after midnight on September 21, 2014, because she was experiencing severe pain in her abdomen and sides. Her pain level limited her ability to communicate, and Mr. Miller tried to communicate with medical personnel on her behalf. He presented his agency card[2] to request an interpreter upon their arrival, again twenty minutes later while a medical assistant took Ms. Miller's vital signs, a third

---

[2] Mr. Miller's agency card was issued by the Hearing Speech and Deaf Center of Cincinnati. It informs the recipient that Mr. Miller is a deaf person and that he needs them to get a sign language interpreter so they can communicate. It provides telephone numbers which can be used to contact a qualified interpreter at any time. (Exhibit A and B to M. Miller Affidavit, Docs. 23-2 and 23-3.)

time when they encountered a person they knew, and a fourth time as Ms. Miller was being registered. Although the Millers were informed that an interpreter was on the way, none arrived and no VRI was offered. After frustrating trips back and forth from the CT scan area to the emergency room (as the CT technician wanted to wait for an interpreter but the emergency room nurse wanted the scan performed immediately whether an interpreter was present or not), Ms. Miller was given a CT scan, an IV, and a prescription. Mr. Miller tried to decipher communications relating to her treatment by reading lips. However, lip reading is less effective than an interpreter under the very best of circumstances for the Millers,[3] and it was further complicated by the fact that medical personnel spoke to them while walking around the room performing tasks and looking back and forth between the two of them, thereby making it impossible for Mr. Miller to fully understand what was being said. Ms. Miller was ultimately diagnosed with a urinary tract infection. Days later, when her pain continued, Ms. Miller went to her primary care physician who referred her to her gynecologist who discovered a fibroid. Once the fibroid was surgically removed, Ms. Miller's pain finally ceased.

Mr. Miller has emailed and texted TCH Patient and Guest Services many times regarding the challenges they face obtaining routine medical care and communicating effectively. (Exs. A–Z to M. Miller Aff., Doc. 23-2 through 23-27.) While TCH offers courteous responses, the Millers claim that the communication issues continue unabated. (*Id.*)

---

[3] Mr. Miller states that he is able to read lips with the assistance of a hearing aid only "when the person is facing me, has no facial hair, speaks slowly and deliberately moves their mouth to form words." He estimates that under the best of circumstances he understands 40 to 50 percent of what is being said. (Doc. 23-1 at PageID 548–49.)

B. **Procedural Posture**

The Millers initiated this action alleging three counts of discrimination and three counts of retaliation pursuant to the Americans with Disabilities Act, the Rehabilitation Act of 1973, and Chapter 4112 of the Ohio Revised Code. (Doc. 1.) The Millers filed a Motion for Partial Summary Judgment on Counts 1–3, the discrimination claims. (Doc. 26.) TCH filed a Motion for Summary Judgment on all claims. (Doc. 27.) The Millers do not oppose summary judgment on Counts 4–6, the retaliation claims. (Doc. 29 at PageID 1042, n.1.) Thus, this matter is before the Court on cross-motions for summary judgment as to the discrimination claims only. Specifically, the Millers allege that TCH discriminated against, and continues to discriminate against, them on the basis of their disability by denying them auxiliary aids and services necessary to ensure effective communication and equal opportunity to participate in and benefit from TCH's health care services in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Ohio Revised Code § 4112.02(G).

## II. APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014).

"The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Where the parties have filed cross-motions for summary judgment, the court must consider each motion separately on its merits, since each party, as a movant for summary judgment, bears the burden to establish both the nonexistence of genuine issues of material fact and that party's entitlement to judgment as a matter of law." *In re Morgeson*, 371 B.R. 798, 800–01 (B.A.P. 6th Cir. 2007).

### III. ANALYSIS

As the parties correctly state, courts analyze disability discrimination claims under the ADA, the Rehabilitation Act, and Ohio Revised Code Chapter 4112 pursuant to the same legal framework. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010); (Doc. 26 at PageID 795 and Doc. 28 at PageID 1003).

> To prevail, a disabled person must prove that he or she was excluded
> from participation in or denied the benefits of the hospital's services,
> programs, or activities, or otherwise discriminated against on
> account of her disability. *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th
> Cir. 2001). Such exclusion, denial, or discrimination occurs when a
> hospital fails to provide "appropriate auxiliary aids and services" to
> a deaf patient, or a patient's deaf companion, "where necessary to
> ensure effective communication." 28 C.F.R. § 36.303(c)(1).[4]

*Silva v. Baptist Health South Florida, Inc.*, 856 F.3d 824 (11th Cir. 2017). Plaintiffs do not have to establish that the means of communication used resulted in adverse medical treatment nor articulate information they were unable to convey or understand during their hospital visits. *Id.* at 833. "Instead, the correct standard examines whether the deaf patient experienced an impairment in his or her ability to *communicate* medically relevant information with hospital staff. The focus is on the effectiveness of the communication, not on the medical success of the outcome." *Id.* (emphasis in original).

### A. Effectiveness of Communication

Pursuant to the ADA's implementing regulations, "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities . . . [including] companions who are individuals with disabilities." 28 C.F.R. § 36.303(c)(1). "Available auxiliary aids for deaf individuals include qualified in-person interpreters, VRI, computer-aided transcription services, written materials, and the exchange of handwritten notes." *Bustos v. Dignity Health*, No. CV-17-02882-PHX-DCG, 2019 WL 3532158, at *2 (D. Ariz. Aug. 2, 2019). "The type of auxiliary aid or

---

[4] Title III of the ADA applies only to "places of public accommodation," and the Rehabilitation Act requires that Defendants receive Federal financial assistance. 42 U.S.C. § 12182(a) and 21 U.S.C § 794(a). Defendants in this case admit that they operate a place of public accommodation and receive Federal financial assistance. (Doc. 4 at PageID 38.) They further admit that the Millers are disabled people by virtue of being deaf. (*Id.*)

service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii). "For instance, a deaf patient 'may need a qualified interpreter to discuss with hospital personnel a diagnosis, procedures, tests, treatment options, surgery, or prescribed medication[,]' whereas a person with the same disability 'who purchases an item in the hospital gift shop may need only an exchange of written notes to achieve effective communication.'" *Bustos,* 2019 WL 3532158, at *3 (quoting *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 343 n.5 (11th Cir. 2012)).

"A public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii). "A hospital that chooses to use VRI must ensure that it provides video and audio over a connection that delivers 'clear, audible transmission of voices' and 'high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication[.]'" *Bustos,* 2019 WL 3532158, at *2 (quoting 28 C.F.R. § 36.303(f)); *see also Juech v. Children's Hosp. and Health Sys., Inc.*, 353 F.Supp.3d 772, 782 (E.D. Wis. 2018) ("[A]t some point it is no longer an isolated technical glitch but instead amounts to discrimination if it results in ineffective communication.").

In determining the effectiveness of communication, the Court must "examine whether the hospital provided the kind of auxiliary aid necessary to ensure that a deaf patient was not impaired in exchanging medically relevant information with hospital staff." *Silva*, 856 F.3d at

835.  Because the assistance required to ensure effective communication will vary based on the specific circumstances surrounding each interaction, "the task of determining whether an entity . . . has provided appropriate auxiliary aids where necessary is inherently fact-intensive." *Liese*, 701 F.3d at 342.  "Generally, the effectiveness of auxiliary aids and [] services is a question of fact precluding summary judgment." *Bustos*, 2019 WL 3532158, at *3 (quoting *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001)).  While communication need not be perfect, the relevant statutes require that "hospitals afford a level of communication to a deaf patient about medically relevant information that is substantially equal to that afforded to non-disabled patients."  *Silva*, 856 F.3d at 835 (italics omitted).

In this case, Plaintiffs have offered evidence that they are deaf, use ASL as their primary language, are limited in their ability to vocalize intelligible English words, and have a limited ability to read and write English—due in part to the syntactical differences between ASL and English.  In addition, Ms. Miller's medical conditions impact her comprehension and memory, thereby further impairing her ability to use written communication.  The Millers have identified several instances in which TCH provided neither an ASL interpreter nor an effective alternative aid.  In addition, while VRI may sufficiently support effective communication under some circumstances, the Millers have identified several occasions on which the VRI malfunctioned, was unavailable, or was used improperly by TCH staff.  Thus, the Court concludes that— construing all evidence in favor of the Plaintiffs—reasonable jurors could find that the Defendants failed to afford a level of communication to the Millers that is substantially equal to that afforded to non-disabled patients.

In contrast, Defendants offer evidence that for approximately 370 medical appointments since September 1, 2014, TCH provided ASL interpreters, VRI, and other appropriate auxiliary

aids. Defendants also have offered at least limited evidence that Mr. Miller's communication skills are such that he may not require the highest level of auxiliary aid to communicate effectively. In addition, while THC's efforts have proven imperfect, perfection is not the applicable standard. In fact, THC acknowledges that communication with non-disabled patients is likewise imperfect as they argue that Plaintiffs seek "to hold health care providers liable for inconveniences and scheduling issues common to all consumers of health care services everywhere." (Doc. 27 at PageID 877–78.) Accordingly, the Court concludes that issues of fact preclude summary judgment for either party on the effective communication issue.

## B. Injunctive Relief

Defendants contend that, even if effective communication was not achieved, they are entitled to summary judgment because Plaintiffs lack standing to seek injunctive relief and because the injunctive relief sought would create an undue burden on Defendants. The Court will address these issues individually.

### 1. Standing

Plaintiffs in this case seek injunctive relief, including requiring TCH to improve staff training, to increase the number of VRI devices available, and to confirm interpreter appointments in the same way TCH confirms patient appointments. Defendants contend that Plaintiffs lack standing to seek prospective injunctive relief. The Court disagrees.

Article III of the Constitution "requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *ACLU v. Natl. Sec. Agency*, 493 F.3d 644, 659 (6th Cir. 2007) (quoting *Valley Forge Christian Coll. v. Ams. United for Sep. of Church & State, Inc.*, 454 U.S. 464, 472 (1982)). "The injury inquiry is thus twofold where a plaintiff requests injunctive relief,

as it requires plaintiff to show both 'past injury and a real and immediate threat of future injury.'" *Mosley v. Kohl's Dept. Stores, Inc.*, No. 19-1106, ___ F.3d ___, 2019 WL 5850463, at *2 (6th Cir. November 8, 2019). One way to demonstrate the real and immediate threat of future violations is to determine Plaintiffs' likelihood of returning to the defendant hospital "through an established pattern." *Juech*, 535 F.Supp.3d at 785. A plaintiff can also demonstrate the requisite threat of future injury by establishing "a plausible intent to return to the noncompliant accommodation." *Mosley*, 2019 WL 5850463, at *3.

In this case, Defendants acknowledge that Plaintiffs have sought medical treatment at TCH more than 400 times since 2014. In addition, Plaintiffs testified that they intend to continue to seek medical treatment at TCH because TCH facilities are conveniently located and already maintain their medical records. Other courts have concluded that these very factors are sufficient to establish standing in similar disability discrimination cases. *Silva*, 856 F.3d at 832–33; *Juech*, 535 F.Supp.3d at 786. This Court agrees.

### 2. Reasonableness of Modification and Waiver of Affirmative Defenses

As discussed above, "a public accommodation must provide auxiliary aids and services to individuals with disabilities if such individuals need those aids and services to enjoy 'meaningful access' to the public accommodation." *Childress v. Fox Associates, LLC*, 932 F.3d 1165, 1170–71 (8th Cir. 2019) (quoting *Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013)). Once it is determined that the auxiliary aid requested is both reasonable and necessary, the public accommodation must provide the aid "unless doing so would be an undue burden or would fundamentally alter the nature of the provided benefit." *Id.* at 1171; *see also Access Center for Indep. Living v. WP Glimcher, Inc.*, No. 3:15-cv-444, 2018 WL 2763453, at *4 (S.D. Ohio June 8, 2018). "Both the undue burden and the fundamental alteration arguments are affirmative

defenses provided by the ADA. . . Failure to raise an affirmative defense before the district court constitutes waiver of that defense." *Childress*, 932 F.3d at 1171 (internal citations omitted).

In the case at bar, Plaintiffs contend that Defendants waived these affirmative defenses by "failing to marshal any facts that the Millers' requested auxiliary aids and services and policy modifications are unduly burdensome or would impose a fundamental alteration of their services." (Doc. 29 at PageID 1050.) The Court disagrees.

First, Defendants specifically pled the affirmative defense of undue burden in their answer. (Doc. 4 at PageID 42.) Second, Defendants are not obligated to provide evidence in support of their undue burden defense until it is determined that the auxiliary aid or requested modification is reasonable and necessary to ensure effective communication. *See Childress*, 932 F.3d at 1171; *see also Access Center for Ind. Living*, 2018 WL 2763453, at *4. Because issues of fact preclude summary judgment on the reasonableness and necessity of the requested aids and modifications, Defendants are not yet obligated to produce evidence that the requests would cause an undue burden.

### C. Monetary Damages

Monetary damages are not available under Title III of the ADA. *Southwell v. Summit View of Farragut, LLC*, 494 F.App'x 508, 512 (6th Cir. 2012). Under the Rehabilitation Act, however, compensatory damages are available upon "a showing of intent to discriminate." *Hill v. Bradley Cty. Bd. of Educ.*, 295 F.App'x 740, 742 (6th Cir. 2008).

To prove intent to discriminate for Rehabilitation Act purposes, a plaintiff must prove a defendant acted with "deliberate indifference." *Id.*; *Silva*, 856 F.3d at 841; *Juech*, 353 F.Supp.3d at 782–83; *Bustos*, 2019 WL 3532158, at *4. To establish deliberate indifference, a plaintiff must show that "the defendant knew that harm to a federally protected right was substantially

likely and . . . failed to act on that likelihood." *Liese*, 701 F.3d at 344–45; *Juech*, 353 F.Supp.3d at 782; *Silva*, 856 F.3d at 841 (using the same quoted language). "As such, a hospital's failure to provide an interpreter on demand is not sufficient to support a finding of deliberate indifference . . . Rather, a plaintiff must show that hospital staff knew there was a substantial likelihood that they would be unable to communicate effectively absent an interpreter, but still made a 'deliberate choice' not to provide one." *Martin v. Halifax Healthcare Sys., Inc.*, 621 F.App'x 594, 604 (11th Cir. 2015).

In the case at bar, the Millers repeatedly texted or emailed their communication failures and ongoing frustrations to a Senior Services Representative at TCH. (*See, e.g.,* Doc. 23-7 at PageID 589; Doc. 23-9 at PageID 591–92; Doc. 23-10 at PageID 593; Doc. 23-11 at PageID 595; Doc. 23-13 at PageID 598; 23-14 at PageID 599–600; Doc. 23-15 at PageID 601; Doc. 23-17 at PageID 605; Doc. 23-18 at PageID 606–07; Doc. 23-19 at PageID 608–09; Doc. 23-20 at PageID 610; Doc. 23-21 at PageID 612.) Thus, Plaintiffs have established that Defendants knew about the alleged past and potential future violations. However, TCH took at least some action in response to many of the alleged violations. (*See, e.g.,* Doc. 23-7 at PageID 588; Doc. 23-9 at PageID 591; Doc. 23-10 at PageID 593; Doc. 23-12 at PageID 596; Doc. 23-16 at PageID 602; Doc. 23-19 at PageID 608; Doc. 23-22 at PageID 613.) Plaintiffs allege that TCH's responses, however, were inadequate to protect Plaintiffs' right to effective communication. Because Plaintiffs have offered evidence that Defendants' actions resulted in little improvement to their allegedly ineffective communication, reasonable jurors could disagree regarding whether Defendants essentially failed to act to protect their rights. Accordingly, issues of fact preclude summary judgment on the Plaintiffs' claims for monetary compensation.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment (Doc. 26) is **DENIED**. Defendants' Motion for Summary Judgment (Doc. 27) is **DENIED** as to Counts I, II, and III but **GRANTED** as to Counts IV, V, and VI.

The Court will conduct a Final Pretrial Conference on **December 16, 2019 at 10:00 a.m. The Plaintiffs and a TCH corporate officer or board member with full settlement authority must attend the Final Pretrial Conference.** Trial in this matter is scheduled for **January 13, 2020 at 9:30 a.m.**

**IT IS SO ORDERED**.

Dated: November 18, 2019       S/Susan J. Dlott_____
                               Judge Susan J. Dlott
                               United States District Court